Good morning. Thank you, Your Honor. And may it please the Court, my name is Paul D. Cullen, Jr. and I represent the Owner-Operator Independent Drivers Association, or OOIDA. And with the Court's permission, I will attempt to preserve three minutes for rebuttal. OOIDA is a trade association that has 150,000 members across the country and was founded 50 years ago to represent owner-operator truckers. Here OOIDA seeks to protect a very specific sector of the trucking industry, leased owner-operators. These are the individuals who lease their trucks and driving services to motor carriers as independent contractors. This is an essential sector. So how do we, do we just go OOIDA or do we go OODA or what do we say? Or OOIDA.  Oh, okay. This leased owner-operators are an essential sector of the trucking industry and have been governed and protected by federal regulations for 70 years. Counsel, can you tell me how this law, AB 5, would burden OOIDA? OOIDA is here in its representational standing on behalf of its members who are directly affected by. How would it, I apologize, and how would it burden your members? AB 5 categorically prohibits leased owner-operators from operating in California. The ABC test, the B part of the test, requires the person provides work, the ABC test is the test that a, that a worker or their business must prove to establish that they are an independent contractor. The AB 5 assumes everyone is an employee. The B part of- I have a little, oh go ahead, I want you to finish, I'm sorry. The B part of the test requires that the person, the worker, provide work that is outside the usual course of the hiring entity, the business. And leased owner-operators are in the same business as motor carriers. They haul freight, move freight in interstate commerce. This, this complete prohibition on this category of the trucking industry is an unreasonable burden under the Dormant Commerce Clause. AB 5's prohibition goes beyond any norm, any notion of a burden under the PIKE balancing standard. So Council, my understanding is that the burden that OIDA for its members articulated was an increased compliance cost, is that correct? That is not correct. Okay. The burden is the prohibition on leased owner-operators from working in California. Well, it seems that you're getting, I think your arguments were better before. There's putting more nails in this coffin, and maybe one of the most recent ones was my colleague Judge Bress wrote an opinion called Flint, and I don't think that's helpful to you. In what respect, Your Honor? Well, it just, it seems like the type of things that you're challenging, and it comes up in different professions, it seems like that the people that are similar, you know, independents or that they're similar, they're losing. Bonta Keep is starting, continues to win in this, and I think in, that was the situation where licensees who held gambling license to own and operate card rooms in California filed suit against the Attorney General, and they were saying from owning more than 1 percent interest in out-of-state business that engaged in casino-style gambling or had control over such businesses and whether that violated the Burma Commerce Clause, and I just think that the ruling in that case doesn't help you. That case can be distinguished in that that case was not concerned with whether or not card table businesses could exist or not. Here we're talking about whether leased owner-operators can exist as a business and do, and operate in California. Well, what about Exxon then? The Exxon doesn't help you. That's an older case. The Exxon facts are not coming to me at the moment, Your Honor. The Pike balancing test has allowed burden, state laws to burden and raise the costs of doing business, but there is no cost or burden that leased owner-operators can pay to keep their small business as leased owner-operators in California. Would they qualify for a B-to-B exception? Is there any way they could qualify? I feel like you're speaking in absolutes, like there is absolutely no way, and I don't know that that's accurate given the record that was presented to this Court. That is accurate in that the B-to-B, no party, neither of the defendants have asserted that leased owner-operators to motor carriers can use the B-to-B exception. And we explain why in that case. One of the requirements of the business-to-business exception is that the worker be free from the control of the business. Leased owner-operators in interstate commerce must comply with federal regulations called the Truth in Leasing Regulations, which require the motor carrier to have exclusive possession and control of the vehicle and the operation of that vehicle in interstate commerce. Whatever the scope of that control is, it can't be squared with the B-to-B requirement that the worker be free from control. It's irreconcilable. And that's why our claims for, and therefore, those rules that, those federal rules that apply to leased owner-operators in interstate commerce, this makes the B-to-B exception available to, not available to those operating in interstate commerce, but makes it available to intrastate California drivers who do not need to follow the federal rules. But now, the appellees allege that the B-to-B exemption does not draw a distinction between intrastate and interstate owner-operators, and therefore, doesn't violate the Equal Protection Clause. So where is the distinction? The distinction is made by the, by the requirements of federal law, which impose requirements on intrastate motor, leased owner-operators. So it's not in the B-to-B? It's not actually in the B-to-B? It is not stated in the B-to-B. On its face, it does not appear to be discriminatory, but in effect, it does, in that it conflicts with this federal law. It does not conflict, and so it, because it conflicts with federal law, it's not available to the motor carriers and drivers who, under federal law, are required to comply with those truth-in-leasing rules. Can I go back, just for you to clarify for me, does your complaint allege a facial or an as-applied challenge to AB 5? It's a facial challenge, Your Honor. Let me ask you more questions about the truth-in-leasing regulations. Do they apply to all interstate drivers, whether or not they're based in California or based out of state? That's correct, and the truth-in-leasing regulations are authorized by 49 U.S.C. 14-102, which refers to the jurisdiction of the Department of Transportation at 49 U.S.C. 13-501, which defines which motor carriers and drivers are required to comply with the underlying rules. And does that matter whether the driver is classified as an independent contractor or as an employee? Is there a difference for the truth-in-lending purposes? I'm sorry, truth-in-leasing? Yes, because the truth-in-leasing regulations applies to motor carriers operating in interstate commerce who lease vehicles, and typically the driving services, vehicles that they do not own. That's the definition in 14-102. So yes, it applies. The general practice, overwhelming practice in the industry, is that those independent contractors are the truck owner and operator who leases their truck and driving services to the motor carrier. And it's the unavailability of the B2B exception on those claims that it discriminates against interstate commerce by the terms of the federal rules that governs interstate truckers. And it also is the basis for our equal protection claim, because you have two groups of nearly identical individuals, leased-owner operators in California and leased-owner operators in interstate commerce, intrastate commerce in California, interstate commerce, some in California and those in the rest of the country, that are treated differently. One has provided the B2B exception and the other has not. And there's no rational basis for it, because the B2B exception is allowed to, is given to in-state drivers who are presumably the individuals who California has the most interest in seeing protected by their employment laws, but not provided to out-of-state, interstate truckers who California has little or no interest in protecting under its employment laws. What was the purpose of the Truth in Leasing Regulations, do you know? The purpose of the Truth in Leasing Regulations is to make motor carriers, there are two purposes. First, to make motor carriers responsible for the operation of the independent contractors it engages with. And the Truth in Leasing Regulations were intended to support leased-owner operator businesses to set up standards for their contracts and disclosures and disclosures related to how they're compensated and other financial arrangements to make sure that those individuals are protected. And that's why they've been such a, that's a recognition of the importance of that segment of the trucking industry for, as I said, 70 years now, that the federal rules work to ensure that that sector of the industry remains as it is. Council, let me ask, I know you argued earlier that the B2B exception violates the Equal Protection Clause because it treats interstate and intrastate truck drivers differently without a rational basis. Yes. Does your argument depend on this panel assuming that that B2B exception conflicts with the Truth in Leasing Act or regulations? That is the purpose, that is the basis of that claim. So if we don't agree with you on that, do we still have to continue to analyze the rest of your claims? Yes, because our main claim is the burden claim under the PIKE burden analysis. The opposite is true. If you resolve the PIKE balancing test in our favor, then you do not need to decide the B2B issue. And so for, I'd like to specifically describe our prayer for relief for truck drivers, leased owner operators who are based outside the state, who come into the state temporarily to drop off and pick up loads. They spend less than 50% of their time. Under the PIKE balancing test, the defendants have offered into evidence no evidence that the state has an interest in enforcing its employment laws on these truckers. In fact, in both their briefs, they practically concede this issue by questioning whether the state has any such interest. And that's the state at page 27 and the IBT at page 36. So at least to our prayer for relief for the out-of-state leased owner operators, the PIKE balancing test could not be more stark. The burden is they lose their business or they have to give up all business going into California and the benefit to the state is not, there is no evidence. And what are we asking for? The relief we're asking is not that the court declare these leased owner operators are independent contractors. We're simply asking that they be judged under the prior Borrello standard as provided in AB 5 under section 2775A3, which provides if a court of law rules that a three-part test in paragraph one cannot be applied to a particular context, then the Borrello test would apply. And the Borrello test was very successful. The defendant's own witness stated that they submitted evidence that in the cases that they brought, that the state brought to address worker misclassification issues in trucking, they succeeded 97% of the time. Well, wait a second, counsel. Wasn't the efficacy of the Borrello test questioned by the California Supreme Court in Dynamex or Dynamic? It was questioned. It was. So they, I mean, it wasn't, it's not a test that is a slam dunk that everybody thinks, hey, if you use Borrello, you'll get it right. And I'll quote to you from that case. It says, a number of state courts, administrative agencies, and academic commentators have observed, however, that such a wide-ranging and flexible test for evaluating whether a worker should be considered an employee or an independent contractor has significant disadvantages, particularly when applied in the wage and hour context. So Borrello's not the slam dunk that you're making it sound to be. Well, I'm not sure what, and we can't tell from the Dynamex opinion, what evidence the court was relying upon at that point. We do have the statistic provided in this case, in this evidence, that in 1,000 cases brought to address worker classification issues against truckers, they won 97% of the time. And I would like to note that the Ninth Circuit has decided that in the Union Pacific Railroad case in 2003, that administrative ease in enforcing laws is an insufficient state benefit to justify the burden. And the burden there was simply that the railroads rearranged their cars in a different manner in order for them to do that inspection. Here the burden is they lose their small business entirely. And that point is not under dispute here. Leased owner-operators are prohibited from operating in California under AB 5. That was the purpose of the law as stated by the proponents of the law. So do you want to save the balance of your time? Yes, Your Honor. Did you have a different question? I'm good. Thank you. Okay. All right. We'll hear from Mr. Harbort. Good morning. Good morning, Your Honors, and may it please the Court. OIDA has challenged the AB... Are you really Mr. Harbort? I am. Okay. Did I say that right? You did. Okay. And I'm from Louisiana, so people often assume it's French. So that was good. So OIDA's challenge to the ABC test is contrary both to the law and to the evidentiary record before the district court. As to the law, a plaintiff pursuing relief under Pike must first show a substantial burden on interstate commerce, and then, if such a burden exists, that it is clearly excessive in light of the law's benefits. So would you prefer that we determine that OIDA's claim fails as a facial challenge or consider it as an as-applied challenge? Your Honor, either would be acceptable to us, and we briefed both. What I would say is the path suggested by the lion's share of this Court's precedent is not to look to the facial versus as-applied standard and just to apply the substantial burden framework under Pike and hold, as you could hear as a matter of law, that OIDA has not shown that the ABC test is invalid under Pike in any of its applications. Let me ask you this, counsel. What interest does California have in regulating truck drivers who only enter, as your friend on the other side said, to grab a load, take a load? What interest does California have in regulating those folks? We may not have an interest in those folks. So the problem with the way that OIDA has structured their claim is that the class of out-of-state drivers that they principally seek to represent is very large. It includes very diverse working arrangements. So I believe the class, as they've defined it, includes all out-of-state drivers who spend some time in California but less than 50% of their time. So that could include, at one end of the spectrum, the type of arrangement your Honor just mentioned, but at the extreme other end of the spectrum, it could include someone, say, based in Nevada who spends 49% of his time driving within California for, say, whole days or weeks at a time. And under the California Supreme Court's decisions in Oman and Sullivan, which are cases that have looked at very similar issues about the extent to which California labor standards apply to workers who work in multiple states, I think it's quite likely that at least some aspects of California labor law would apply to those types of workers. Well, but why isn't, if as OIDA alleges, AB 5 will cause owner-operator truck drivers to avoid California, why isn't this a burden on interstate commerce? Your Honor, for a couple of reasons, one evidentiary, one legal. The evidentiary is OIDA has not come anywhere close to establishing that type of effect as a factual matter, and this case is arising after a bench trial where the district court's conclusions were informed by that complete evidentiary record. But the more fundamental reason is legal in nature, and it goes to a case that Your Honor mentioned earlier this morning, which was the Exxon decision, which considered pretty similar factual allegations, where Maryland decided to- It's kind of an old case, too. It's a fairly old case, but it has been repeatedly invoked, including in very recent decisions of this court, like this court's decision in National Pork Producers. It's discussed in the Flint decision issue just a few weeks ago that Your Honor also mentioned. And that case was similar in that it involved a restructuring of Maryland's gasoline industry, and the court recognized that a likely effect of the restructuring was that it would lead a number of gasoline businesses to exit Maryland's marketplace entirely. And the court held that that type of effect may be significant economically speaking, but it's not the type of burden that gives rise to concerns under the Dormant Commerce Clause. I think the same could be said here, which is that even if it were true that the ABC test would lead owner-operators to exit California's market, that's just not the type of burden that gives rise to concerns under PIKE. Is there anything in this record showing that some previously owner-operator truck drivers have contracted as independent businesses under B2B? I'm sorry, Your Honor, could you repeat the first part of the question? Is there any evidence in this record showing, or anything in this record that shows that some previously owner-operator truck drivers have contracted as independent business under B2B? Your Honor, I'm not sure that there's record evidence establishing that any owner-operators have actually been able to satisfy all the prongs of the business-to-business exemption, but we strongly disagree with OOIDA's suggestion as a legal matter that owner-operators would be categorically barred from taking advantage of the business-to-business exemption. It's sort of, but it's like, okay, but depending on what the pull is, if no one's ever gotten it, but it's still possible, I mean, when you say no one's ever gotten it, what are we looking at here? Well, I'm not sure that no one has ever gotten it, Your Honor, and I'd point the court to the California Court of Appeals decision in the CalCartage case, which discussed record evidence there that the court viewed as establishing that at least it would be possible for some owner-operators in the trucking industry to establish the business-to-business exemptions prongs. But I mean, the exemption was intended to be a demanding standard for a reason, which is the California legislature reasonably decided for some of the same reasons the California Supreme Court examined in the Dynamex decision to make the ABC test the central worker classification standard under California law. And one of the key problems with OOIDA's legal theory here is it depends on this assertion, which you heard again this morning, that the ABC test categorically bars owner-operators from California's market. That's simply not true as a matter of law. What the ABC test requires at most is that owner-operators be classified as employees. And this court previously acknowledged that legal possibility in its California Trucking Association opinion, which of course was considering a preemption issue, not the dormant commerce clause. But in footnote 11, the court expressly mentioned the possibility of classifying owner-operators as employees. And I think what my friend on the other side objects to about that is not so much that it's a categorical bar to their operation in the state. It's that classification as employees, in his view, will lead to increased business compliance costs. That may well be the case, but this court has repeatedly held in cases like Ward and National Pork Producers that increased business compliance costs do not suffice to give rise to a substantial burden at the first step of the pike balancing test. So what is your view about how Flint affects your argument here today? Because I think obviously that's a fairly recent opinion, I think March of this year. Your Honor, it strengthens it. And I think Flint, unlike this case, actually did involve something that could be characterized as a categorical bar. It was a categorical bar on the ability of casino owners to operate card rooms in California. And the court held that that did not give rise to a sufficient burden to overcome the threshold step of pike. I think a for sure, the same would be true here where we don't have a categorical bar. We have a new worker classification standard that may effectively require many owner operators to be classified as employees. But again, we're just talking about effects in terms of increased compliance costs, and that's not sufficient under the first step of pike. So this is merely hypothetical, but if we were to agree with you, is this something that needs to be an opinion, that it needs to be published? Your Honor, the state would, of course, defer to the court on that. But our view is the circuit has a striking number of decisions rejecting pike claims both at the first step or at the second step, the ultimate balancing inquiry. So I'm not sure that there is a compelling need for another published opinion in this area, but again, we would defer to the court. I also wanted to briefly respond to opposing counsel's theory that the business-to-business exemption is unavailable in effect to owner operators subject to the federal truth and leasing regulations. That claim fails for multiple independent reasons, but the most straightforward, I think, is that it is premised on a misunderstanding of California state law. OOIDA's theory is that the federal regulations require certain forms of control that effectively disqualify owner operators from satisfying the control prong of the business-to-business exemption. The problem with that theory is that it's well established under California law that the forms of control mandated by state or federal regulation do not qualify as relevant when assessing control for purposes of worker classification. And the most relevant cases in the briefing on this point are the Linton v. DeSoto Cab Company and the Southwest Research Institute cases where the California Court of Appeal recognized this well-established principle. So the upshot is that there is no categorical bar to owner-operator drivers being able to satisfy the control prong of the exemption. Your Honors, if there are no further questions, we'd respectfully ask the court to affirm. Thank you. You can probably give a little extra time to your other person, but you don't need to talk more than five minutes if you don't want to. But there's a little bit of time on the clock. Which would make me more generous than I would otherwise be. Good morning. Good morning, Your Honors. And may it please the court, Robin Tholen, appearing for Intervenor Defendants International Brotherhood of Teamsters. We agree with the state's analysis of the law that was just presented, and I would like to briefly address two factual points and, of course, subject to the panel's questions. First, straightforwardly, the facts in this record show that AB 5 does not wholly ban or prohibit leased owner-operators from operating in California. There are two different ways that drivers can still own their own trucks and drive as leased owner-operators. First is that they can be classified as employees. The record showed that it is entirely practical for motor carriers to classify these drivers as employees and pay them using the two-check system, where drivers are paid one check for their labor and one check for the maintenance costs and other costs associated with the ownership of their trucks. Second, if drivers want to be truly independent, they can obtain their own operating authority under the Federal Motor Carrier Safety Administration, and if they do so, they can contract as another business and therefore fall under the business-to-business exception if they meet the other prongs of that test. Well, what I'm hearing on that point is that they technically can, but no one knows of anyone that's ever qualified. Is that a correct characterization? Your Honor, I'm not sure that that's entirely correct because the business-to-business exception isn't something you would apply for and thus receive. It just exempts drivers who meet it who would be subject to AB5 and therefore have to classify their drivers according to the ABC test. It allows them to use the Borrello standard. There isn't some sort of a list of motor carriers who have successfully used the business-to-business exception, and I think that the Cal Carthage case demonstrates that it is available to drivers who are still lease-to-owner operators who essentially have their own businesses. It's quite narrow, however. It is narrow, Your Honor, but that doesn't mean that it forecloses the entire industry in particular because there are multiple avenues here. The industry, as OOIDA defines it, incorporates an independent contractor standard. They define the prohibited lease-to-owner operators as independent contractor-owner operators, but of course that's a legal analysis and the state is permitted to regulate in labor law who qualifies. Those drivers can still own their own trucks and can still drive as employees. Did you have a different or the same answer as to whether AB5 will cause owner-operator truck drivers to avoid California, and why wouldn't that be a burden? I think we agree with the state on this. The facts are quite clear, and particularly on the facts point, we agree with the state on the law as well, but I want to just emphasize that there were multiple experts whose testimony is in the record here on the side of the state and intervenors. OOIDA did not put forth expert testimony here, and those experts testified that there hadn't been disruptions in the industry that would be expected if the AB5 was actually changing whether drivers came in and out. There were no indicators, there were no changes to indicators like load-to-truck ratios that would be expected from a lack of available drivers. And I would also just like to briefly discuss the truth in leasing regulations as well. The counsel for OOIDA suggested that the truth in leasing regulations are designed to allow for independent contractor, leased owner-operators, but nothing in those regulations is designed to dictate what the employment relationship and employment status of drivers are. They say that expressly in the C4 prong, and in fact, they're neutral on how a state chooses to classify its drivers, which also makes sense because the OOIDA itself argues that its drivers could meet the Borrello standard and should be classified as independent contractors, but that standard also incorporates the control element that they claim conflicts with the business-to-business exception. Control is a touchstone of both the common law test for employment and the Borrello standard, and yet OOIDA continues to argue, argues in its briefs, I believe most expressly on page 10 of the opening brief, that motor carriers can comply with the truth in leasing laws and provide flexibility and independence to the drivers sufficient for them to meet the Borrello and other standards. There's no reason to believe that California would interpret the control element of the B-to-B exception any differently than the control element used in the other standards for employment. If the court has any other further questions, I'm happy to answer otherwise. All right, thank you. Thank you. Thank you, Your Honor. On that last point, Borrello's a completely different test than the test under the B-to-B exception. Borrello has long allowed for individuals to properly be leased-owner operators, and the test under the B-to-B exception requires free from control, whereas under Borrello, it's a measure of whether the employer has more or less control in term, toward getting the, determining the final outcome on the classification. It's a very different step, and that's why the cases counsel for the state described regarding the application, the effect of federal requirements on the worker classification test are, do not, are distinguished here. Because, again, the control test in Borrello was, was there more control than less? It's not an absolute test, as it is under the B-to-B exception. Under B-to-B, you have to be free from control. And whatever the scope of the control under the federal truth in leasing regulations are, it's irreconcilable from the B-to-B exception requirement that the company be, that the driver be free from control of the, yes. You've had a chance, did Exxon refresh itself on the break for you? Yes, it did. Okay, do you want to respond to my question on Exxon? Why that? That case was different in that the state did not, in that case, ban a type of business from operating in its, it banned, similar to Flint, who could operate a service station or a card plane. But it did not ban a, a category of business from operating in a state such as AB5. And I'd like to clarify opposing counsel's description that you could just be an employee or a motor carrier. As we've described, these are very different entities here. They try to conflate the three as, as, as just truck driving jobs. But as we've described, that becoming an employee is not a truck, is not a small business employer. And becoming a motor carrier, as we say, our analogy in our brief, is that it's like AB5 to trucking is like a law that would tell a lawyer, you can't be a lawyer anymore, but you can be a paralegal, like an employee. You're over time at this point. I'm going to close it. I'm assuming hypothetically, if we were to agree with you, you would think we needed an opinion. Yes, your honor. The, as our, as our evidence states in several of our declarations, motor carriers are avoiding taking freight to California out of fear of being. Okay, you're over, you're over answering. In fear of AB5 enforcement. The question is, if we agree with you, we need an opinion. And if we agree with you, we can do whatever we want, but you don't think you need an opinion. So, all right. Thank you. Thank you both. This will conclude this day, this calendar for argument. We'll be in recess till nine tomorrow. However, after we conference, we'll come back out and speak with the students. And the law clerks can, if they want, they can come more up into the well for people. All right. Thank you. All rise. Oh, wait, I think I took yours. Did I take yours? Just now, I just took one. Okay. Support for this session stands adjourned.
judges: CALLAHAN, DESAI, ALBA